## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN MARK NIEHLS,       :     No. _____
ELIZABETH WEIR, and ANDREW  :
AND KATE AMRHEIN,       :
                       :
       *Plaintiffs*,     :
                       :     COMPLAINT SEEKING
       v.              :     DECLARATORY JUDGMENT
                       :     AND INJUNCTIVE RELIEF
MONTGOMERY COUNTY     :
OFFICE OF PUBLIC HEALTH   :
and MONTGOMERY COUNTY   :
BOARD OF HEALTH,       :
                       :
       *Defendants*.    :

## COMPLAINT SEEKING DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

AND NOW come Plaintiffs, John Mark Niehls, Elizabeth Weir, and Andrew and Kate Amrhein, by and through their counsel, Dillon McCandless King Coulter & Graham, per Thomas E. Breth, Esquire, allege and state the following facts in support of their causes of action against Defendants the Montgomery County Office of Public Health and the Montgomery County Board of Health stating as follows:

## INTRODUCTION

1.     On November 19, 2020, the CDC Director Dr. Robert Redfield stated that K-12 schools should remain open because data shows that schools are among

the "safest places" that kids can be from the pandemic and attempts to close schools are nothing more than an "emotional response."

https://www.dailywire.com/news/cdc-director-schools-among-safest-places-kids-can-be-closing-schools-an-emotional-response-not-backed-by-data: and,

https://www.wgal.com/article/cdc-schools-should-not-be-shutting-down-because-of-coronavirus/34738142.

2.     CDC Director Redfield went on to state "Today, there's extensive data that we have—we've gathered over the last two to three months—that confirm that K-12 schools can operate with face-to-face learning and they can do it safely and they can do it responsibly…" *Id.*

3.     The extensive data referenced by CDC Director Redfield further shows that "The infections that we've identified in schools when they've been evaluated were not acquired in schools. They were actually acquired in the community and in the household." *Id.*

4.     Pennsylvania Governor, Thomas Wolf, joined with the Governors of New York, New Jersey, Delaware, Connecticut, Rhode Island and Massachusetts, to release a joint public statement, to wit:



Medical research as well as the data from Northeastern states, from across the country, and from around the world make clear that in-person learning is safe when the appropriate protections are in place, even in communities with high transmission rates. In-person learning is the best possible scenario for children, especially those with special needs and from low-income families. There is also growing evidence that the more time children spend outside of school increases the risk of mental health harm and affects their ability to truly learn.

New Jersey Governor Phil Murphy • New York Governor Andrew Cuomo • Pennsylvania Governor Tom Wolf • Delaware Governor John Carney • Connecticut Governor Ned Lamont • Rhode Island Governor Gina Raimondo • Massachusetts Governor Charlie Baker

5.      Researchers have found that children who were unable to attend school because of COVID-19 closures were more likely to exhibit symptoms of clinginess, increased irritability and inattention than their school-going peers, and that they experienced disturbed sleep, nightmares, poor appetite, agitation, and separation-related anxiety. *See* W.Y. Jiao, L.N. Wang, J. Liu, S.F. Fang, F.Y. Jiao, M. Pettoello-Mantovani, and E. Somekh, *Behavioral and emotional disorders in children during the COVID-19 epidemic*. J. PEDIATR., S0022-3476(20)30336-X (2020), *available at* https://doi.org/10.1016/j.jpeds.2020.03.013; R.M. Viner, S.J. Russell, H. Croker, J. Packer, J. Ward, C. Stansfield, O. Mytton, C. Bonell, R. Booy, S*chool closure and management practices during coronavirus outbreaks including COVID-19: A rapid systematic review*. LANCET CHILD ADOLESC. HEALTH 4 (5), 397–404, *available at* https://doi.org/10.1016/S2352-4642(20)30095-X.

6.      Research has also demonstrated that the absence of a structured setting, such as is provided in school, for a long duration results in reduced capacity for

engaging in various academic and extracurricular activities, as well as in lower levels of affect.  Some studies have predicted that, when a full return to school is initiated, children who were unable to attend due to COVID-19 distancing may resist going to school and may face difficulty in establishing rapport with their mentors. Consequently, these studies conclude, constraints of movement imposed on children—particularly exclusion from school—can have a long-term deleterious effect on overall psychological well-being.  J. Lee, *Mental health effects of school closures during COVID-19*. LANCET. CHILD ADOLESC. HEALTH, S2352-4642(20)30109-7, *available at* https://doi.org/10.1016/S2352-4642(20) 30109-7; J.J. Liu, Y. Bao, X. Huang, J. Shi, L. Lu, L., *Mental health considerations for children quarantined because of COVID-19*. LANCET. CHILD ADOLESC. HEALTH 4 (5), 347–349, *available at* https://doi.org/10.1016/S2352-4642(20)30096-1; Y. Zhai, X. Du, *Mental health care for international Chinese students affected by the COVID-19 outbreak*. LANCET PSYCHIATRY 7 (4), e22, *available at* https://doi.org/10.1016/S2215-0366(20)30089-4.

7.    According to the Brookings Institute, preliminary estimates suggest that students' learning gains could fall by roughly 70% after extended COVID-distancing, resulting in significant reductions in long-term academic achievement. Jim Soland, Megan Kuhfeld, Beth Tarasawa, Angela Johnson, Erik Ruzek, and Jing Liu, *The Impact of COVID-19 on Student Achievement and What it may Mean for*

*Educators* (May 27, 2020), *available at* https://www.brookings.edu/blog/brown-center-chalkboard/2020/05/27/the-impact-of-covid-19-on-student-achievement-and-what-it-may-mean-for-edu%E2%80%A

8.      Early research into the impact of school closures on children also demonstrates that as the percent of people at home sharply increase, there was a corresponding 12 percent increase in domestic violence and a marked increase in the rate of first-time child abuse.  Likewise, researchers have also cautioned about other non-obvious externalities associated with long-term school absences due to COVID-distancing: malnutrition and an inability to obtain medical care including a possible COVID vaccine.  Results of those studies recommend "an urgent need to quantify the physical and psychological burdens of prolonged lockdown policies." Sanga, Sarath and McCrary, Justin, *The Impact of the Coronavirus Lockdown on Domestic Violence* (May 28, 2020), *available at* https://ssrn.com/abstract=3612491 or http://dx.doi.org/10.2139/ssrn.3612491.

9.      Studies have also highlighted the acute impact that school closure has had on children with special needs: "With the closure of special schools and day care centers these children lack access to resource material, peer group interactions and opportunities of learning and developing important social and behavioral skills [which]  in due time may lead to regression to the past behavior as they lose an anchor in life, as a result of this, their symptoms could relapse."  J. Lee, *Mental*

*health effects of school closures during COVID-19*, LANCET. CHILD ADOLESC. HEALTH, S2352-4642(20)30109-7, *available at* https://www.thelancet.com/journals/lanchi/article/PIIS2352-4642(20)30109-7/fulltext.

10. In turn, these studies note that "[t]hese conditions also trigger outburst of temper tantrums, and conflict between parents and adolescents. Although prior to the pandemic these children had been facing difficulties even while attending special schools, but in due course they had learnt to develop a schedule to adhere to for most of the time of the day. To cater to these challenges, it is difficult for parents to handle the challenged children and adolescents on their own, as they lack professional expertise and they mostly relied on schools and therapists to help them out."  S. Singh *et al, Impact of COVID-19 and lockdown on mental health of children and adolescents: a narrative review with recommendations*, Psychiatry Res. 2020, *available at* https://pubmed.ncbi.nlm.nih.gov/32882598/.

11. Although policies of social distancing and masking have drastically reduced the spread of COVID-19, scientific research makes clear that younger children are less susceptible to COVID-19 and less infectious than older ones, that for most infections of COVID-19 cases reported in children, infection was acquired outside of school, and that closing schools was substantially less effective at reducing community transmission of COVID-19 than other social distancing

interventions.  World Health Organization, Slideshow Presentation, *What we Know About COVID-19 Transmission in Schools*, *available at*

https://www.who.int/docs/default-source/coronaviruse/risk-comms-
updates/update39-covid-and-schools.pdf?sfvrsn=320db233_2.

12.     In fact, the World Health Organization has advised that, in light of the myriad negative impacts of forcing children to remain at home with or without virtual learning, closure of schools should be considered "only if there is no other alternative."  Likewise, several major news outlets have reported several studies indicating no consistent relationship between in-person K-12 schooling and the spread of COVID-19. *Id*.

13.     CHOP PolicyLab has issued guidance that stated that in communities that are experiencing community transmission, "*Community mitigation efforts—principally gathering size limitations, restaurant/bar restrictions and enforcement—should precede any alteration to plans for in-school learning, which should be a last resort.*"

https://policylab.chop.edu/blog/covid-19-outlook-finding-safe-harbor-while-
looking-
forward?fbclid=IwAR04OKllj6avtD3iOQgYLpaFmfrdfxh2LbIyMHFt60Dy2EXF
cwY7m0RiYsA

14.     Specifically, with regard to Thanksgiving, the guidance states in relevant part as follows:

> "In the context of accelerating community transmission, remote learning until after the upcoming Thanksgiving holiday provides an

opportunity to stop the spread of infection that includes the whole family, given the high positivity rate of children in many areas (particularly those ages 11-18). Yet, *since younger children are less susceptible to symptomatic infection, remain in more consistent cohorts, are likely more compliant with in-school safety protocols, and do not have the wider network of social contacts through sports and other activities that older youth do, elementary school and child care could remain in-person.* We also continue to advise that students with special education needs might be prioritized for in-school services in small cohorts, given the greater difficulty they may have learning virtually and the services they receive during the school day." *Id.*

15.     Notwithstanding the research and guidance issued by the CDC and the Pennsylvania Governor, on November 12, 2020, the Montgomery County Board of Health ordered all schools in Montgomery County from kindergarten through twelfth grade, both public and private, including special needs services, to cease in-school operations and switch to virtual learning from November 23, 2020 until December 6, 2020.  The Board reserved the right to extend this closure order at its upcoming meeting on December 2, 2020.

16.     The Board's Order was made in an arbitrary and capricious manner and in direct contradiction of the leading scientific research, data and guidance from the CDC and Governors of six Northeastern States.

17.     "In the earliest days of a pandemic or other true emergency, what may be the least restrictive or invasive means of furthering a state's compelling interest in public health will be particularly uncertain, and thus judicial intervention should be rare. But as time passes, scientific uncertainty may decrease, and officials' ability

to tailor their restrictions more carefully will increase.  What may have been permissible at one point given exigencies and realistic alternatives in the face of those exigencies may not remain permissible in the long term." *Denver Bible Church v. Azar*, 2020 WL 6128994, at \*8 (D. Colo. Oct. 15, 2020) (citing Calvary Chapel Dayton Valley v. Sisolak, 140 S. Ct. 2603, 2605 (2020)

18.    United States Supreme Court Justice Alito further stated "As more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights." *Calvary Chapel supra at 2605.*

## **PARTIES**

19.    Plaintiff, John Mark Niehls, is an adult individual residing in Montgomery County, Pennsylvania, that has been impacted by Defendants' Order.

20.    Elizabeth Weir is an adult individual residing in Montgomery County, Pennsylvania that has been impacted by Defendants' Order.

21.    Andrew and Kate Amrhein are adult individuals residing in Montgomery County, Pennsylvania that has been impacted by Defendants' Order.

22.    Defendant Montgomery County Office of Public Health is an agency of a political subdivision with a principal place of business at 1430 DeKalb Street Norristown, PA 19404.  The mission of the Montgomery County Office of Public

Health is "to provide public health services and foster collaborative actions that empower our community to improve its health and safety."

23.     Defendant Montgomery County Board of Health ("the Board") is a Board of a political subdivision with a principal place of business at 1430 DeKalb Street Norristown, PA 19404.  The Board is a five-member panel that meets at least once every three months. According to Act 315 (Chapter 4, 16 § 12007 - Local Health Administration) and a Montgomery County Resolution dated January 25, 1990, the Board of County Commissioners shall appoint five resident citizens, two of whom shall be physicians licensed to practice in Pennsylvania to serve on the Montgomery County Board of Health.

## <u>JURISDICTION AND VENUE</u>

24.     This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1343 because this matter involves violations of the United States Constitution and the laws of the United States as related to the educational rights of Plaintiffs' children.

25.     Jurisdiction is also proper under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

26.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391 because all claims arise from events which took place in this district.

27.     This Court has jurisdiction to grant declaratory and injunctive relief

pursuant to 28 U.S.C. §§ 2201 and 2202.

28.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988.

29.     Plaintiffs in this case have standing to bring their federal constitutional claims because they have suffered an injury in fact that is actual and imminent, there is a causal connection between the actual and imminent injury and the conduct before the Court, and it is likely that a favorable decision by the Court will redress that injury. *See Lujan v. Defenders of Wildlife (90-1424)*, 504 U.S. 555 (1992).

## STATEMENT OF FACTS

30.     In an effort to combat the spread of COVID-19 in the Commonwealth Pennsylvania, on March 6, 2020, Pennsylvania Governor Tom Wolf ("Governor Wolf") declared a state of emergency in Pennsylvania and authorized the Pennsylvania Secretary of Health, Dr. Rachel Levine ("Secretary Levine"), and the Pennsylvania Secretary of Education, then Pedro Rivera, now Noe Ortega, to administer and enforce any action authorized by law ("the State of Emergency Declaration").

31.     Governor Wolf amended the State of Emergency Declaration on March 12, 2020 and then extended it on June 3, 2020 and on August 31, 2020. The State of Emergency Declaration is presently set to expire on November 31, 2020.

32.     On March 13, 2020, Governor Wolf announced that all schools in Pennsylvania, both public and private, would close for ten business days effective March 16, 2020.

33.     On April 9, 2020, Governor Wolf, in consultation with Secretary Levine, extended the School Closure Order for the remainder of the academic year.

34.     Studies have found that, during the time of the School Closure Order, children ages three to six were more likely to exhibit symptoms of clinginess and children of all ages demonstrated increased irritability and inattention than their school-going peers as well as disturbed sleep, nightmares, poor appetite, agitation, and separation related anxiety.

35.     Other studies found that home confinement of children and adolescents was associated with uncertainty and anxiety attributable to disruption in their education, physical activities and opportunities for socialization, and that the absence of structured setting of the school for a long duration result in disruption in routine, boredom and lack of innovative ideas for engaging in various academic and extracurricular activities.

36.     Indeed, research demonstrated that many children have expressed lower levels of affect for not being able to play outdoors, not meeting friends and not engaging in the in-person school activities and that these children have become

more clingy, attention seeking and more dependent on their parents due to the long term shift in their routine.

37.     Finally, some studies have presumed that children might resist going to school after the lockdown is over that these children may face difficulty in establishing rapport with their mentors after the schools reopen. Consequently, these studies conclude, the constraint of movement imposed on them can have a long term negative effect on their overall psychological well-being.

38.     Studies have also emphasized the impact that the School Closure Orders have had on children with special needs: "With the closure of special schools and day care centers these children lack access to resource material, peer group interactions and opportunities of learning and developing important social and behavioral skills in due time may lead to regression to the past behavior as they lose anchor in life, as a result of this their symptoms could relapse."

39.     In turn, these studies note that "[t]hese conditions also trigger outburst of temper tantrums, and conflict between parents and adolescents. Although prior to the pandemic, these children had been facing difficulties even while attending special schools, but in due course they had learnt to develop a schedule to adhere to for most of the time of the day. To cater to these challenges, it is difficult for parents to handle the challenged children and adolescents on their own, as they lack

professional expertise and they mostly relied on schools and therapists to help them out."

40.     In July 2020, the Montgomery County Office of Public Health issued guidance to schools in Montgomery County "to support the development of the Health and Safety Plan for reopening as required by the Pennsylvania Department of Education."

41.     Read together with the Commonwealth's guidance, the guidance advise that reopening schools can be done safely by appointing a pandemic coordinator responsible for preparedness, monitoring students and staff for symptoms and a history of exposure, maintaining isolation and quarantine protocols, following best hygiene practices, using masks and face shields, maintaining social distance, utilizing ventilation in learning spaces, and developing an appropriate disinfection regimen.

42.     Other organizations, including the CDC and Children's Hospital of Philadelphia, PolicyLab, provided their own evidence-based recommendations and considerations for school reopening.

43.     As a result of the aforementioned guidance, schools throughout the Commonwealth developed and implemented strategies for students to safely return to school in the Fall of 2020.

44.     Upon information and belief, many schools throughout the Commonwealth have established Medical Advisory Committees to provide advice to the schools in light of the pandemic and to coordinate the schools' compliance with guidance issued by the federal, state and local agencies.

45.     Upon information and belief, these Medical Advisory Committees are comprised of physicians, epidemiological researchers, and other members of the community.

46.     Upon information and belief, these committees have devoted countless hours to create a comprehensive strategy and to develop policies and procedures for safe reopening, to analyze applicable state and county health guidance to address specific COVID related questions from administrators, faculty, and parents, to identify avenues for COVID testing, to participate in faculty and parent Zoom meetings, and to review written parent-facing materials.

47.     Some of these committees have created and reviewed internal COVID-associated tracking system to monitor school rates of testing, positivity, and exposure and have collaborated with similar committees from other schools to develop concordant policies and to share information about resources and rates of cases, exposures, and persons-under-investigation, so as to inform broader communal safety.

48.     Since the start of the school year,  these committees have continued to meet regularly via regularly scheduled meetings and ad hoc meetings, which have occurred frequently.  They communicate almost daily with one another, with school staff and administration, and with broader committees from the local communities composed of physician and clinical researchers continuing to explore opportunities to implement school-based surveillance testing, which would allow for identification and isolation of asymptomatic COVID-positive individuals.

49.     The current guidelines and handbooks created by these committees and these schools provide details about the protective layers and rules implemented at the school to ensure safety around masks, physical distancing, hand hygiene, cleaning and sanitizing, windows remaining open throughout the day, symptom screening and visitors to the building.

50.     The protocols listed below have been strictly adhered to by the staff and students of these schools:  (1) face covering - Face masks are required for all students and staff; (2) physical distancing - Seating in all rooms is 6 feet apart; (3) cohorts - Students are divided into small cohorts that  have minimal interaction with each other; (4) screening - Students, staff, and visitors are  required to fill out a health screening prior to entering campus every day; (5) hand hygiene - Students and staff are required to wash and sanitize their hands throughout the day; (6) disinfecting -

Additional cleaning and disinfecting is implemented during the day and every evening.

51.     These handbooks also provide detailed logistics around the school day, including busing, arrival and dismissal and rules around remaining at home in case of symptoms or contact and returning to school after symptoms, exposure or travel. To date, these schools have followed these rules and procedures carefully, which has allowed it to successfully prevent COVID transmission and outbreaks within our schools.

52.     Some schools also require every student to submit a daily symptom report before entering school and have had excellent compliance with its daily symptom and questionnaire system.  These symptom report asks each student (or someone on behalf of a student) and each staff member to affirm that the individual: (1) Does not have a body temperature over 100.3 F and is not experiencing a new cough, shortness of breath or difficulty breathing, chills, repeated shaking, muscle pain, headache, sore throat, or new loss of taste or smell; (2) Has not had close contact within the last 14 days with someone who has a confirmed case of COVID-19; (3) Does not have anyone in his/her household demonstrating symptoms of COVID-19 and/or awaiting the results of a COVID-19 test; and (4) Has not traveled within the last 14 days to a geographic area either within the United States or abroad

where there have been travel alerts issued related to COVID-19 or statements similar to the above.

53.     Upon information and belief, prior to opening school, many of these schools made the strategic decision to curtail in-person extra-curricular activities, including sports teams, for the entire 2020-2021 school year.

54.     Upon information and belief, many schools have reworked their facilities to contribute to success.  Many schools have large facilities that allow for more than six feet of distance between students in classrooms, that allows for groups of students to maintain their own bathrooms, and that are equipped with facilities that exceed the recommended ASHRAE standards for quality indoor ventilation.

55.     Upon information and belief, some schools also provide hospital grade PPE to any teacher who requests it, plastic around the teachers' desks, and provides teachers with financial support for testing if anyone in their household requires it.

56.     Upon information and belief, some schools also have equipped classrooms with video conferencing equipment that allows teachers who have to temporarily quarantine at home to teach remotely, while providing students with a safe and effective atmosphere for learning.

57.     Upon information and belief, some schools have also attempted to minimize the potential for teacher-to-teacher COVID transmission, by creating personal break spaces for each teacher.

58.     Upon information and belief, many schools have appointed their own contract tracers that are in contact with the Montgomery Board of Health and have developed relationships with local area hospitals to schedule same or next day testing for households within the school.  These schools have also subsidized the cost of testing when needed and are exploring plans to transition to vendors who can provide PCR testing kits for diagnostic testing with 48 to 36 hour turn-around results.

59.     Schools who have implemented protocols consistent with federal, state and local guidance have not experienced any outbreaks of COVID-19.

60.     Indeed, some schools have had no cases or only minimal cases attributable to activities outsides of the school and unrelated to the educational programs of the schools.

61.     In response, these schools have crafted strict quarantine and isolation protocols in response to even a singular incident of COVID-19. The protocols implemented by these schools have eliminated the in-school transmission of COVID-19.

62.     The aforementioned measures demonstrate that these schools are able to safely prevent the transmission of COVID-19 within the school setting and safely operate their educational programs.

63.     The success of schools like those described above are not anomalies. In fact, the World Health Organization has issued a report updated on October 21,

2020 noting that "children < 10 years are less susceptible and less infectious than older ones," that "[i]n most infections or COVID-19 cases reported in children, infection was acquired at home," and that "[e]arly modelling studies suggested that closing schools reduced community transmission less than other social distancing interventions."

64.     The World Health Organization also noted that "[c]losure of schools should be considered only if there is no other alternative" and that "[m]ore caution is necessary regarding secondary/high schools and older students compared to primary/elementary schools."

65.     As reported by NPR, "[d]espite widespread concerns, two new international studies show no consistent relationship between in-person K-12 schooling and the spread of the coronavirus. And a third study from the United States shows no elevated risk to childcare workers who stayed on the job."

66.     Notwithstanding the resent uptick in COVID-19 cases, scientists and administrators have resoundingly reiterated that "[e]arly modelling studies suggested that closing schools reduced community transmission less than other social distancing interventions" and that "[c]losure of schools should be considered only if there is no other alternative."

67.     Schools with appropriate policies and mitigation efforts in place did not feel compelled to switch to virtual learning and were not concerned about a possible extension of the School Closure Order issued in March of 2020.

68.     Contrary to Defendants' Order, schools throughout the Commonwealth have been permitted to reopen provided they met the criteria established by the Pennsylvania Department of Health and the Pennsylvania Department of Education.

69.     Upon information and belief, no private schools in the Commonwealth of Pennsylvania were ordered to suspend in-person classes. Thus, like public schools, private schools and parents were free to decide on their own whether they were able to shoulder the responsibility of maintaining a safe learning environment for its students.

70.     Before the Order was issued, on November 11, 2020, Bucks County indicated that "As you have seen this week, PDE and Chop Policy center in Philadelphia, have recently made the suggestion to move to all virtual learning now that transmission is labeled as 'substantial.' *The Bucks County Department of Health unconditionally recommends not to change the model of instruct for your school districts to virtual at this time.*"

71.     Further, the Bucks County Department of Health went on to state as follows:

-There is no existing evidence, anywhere, indicating that in-person schooling contributes to spread in the community.  Likewise, there is no evidence that closures alone will slow spread in the community.
-When a school's health and safety plan is followed, we have not seen any evidence of in-school spread, either to other students or staff.  This doesn't mean it won't ever happen.  But it does mean that our school district health safety plans are extremely effective.
-More than 450 children and staff have been quarantined from close exposures to cases in school, with no positive cases resulting from those exposures.
-Cases brought to school have been traced to exposures outside of school, most commonly household contacts and social gatherings – situations where the involved cases were not masking appropriately.  These exposures will continue to occur regardless of a school's status.
-Almost 40% of our cases have occurred in students and staff that were in <u>full virtual mode</u> at the time of infection.
-We have had more than 1200 cases in Bucks County children with only mild disease so far; none have been hospitalized or severely ill.  While it's clearly not impossible to occur, the numbers indicate it's very rare.

The current data indicates that, because of our strong school health and safety plans, children and teachers are safe in our schools, even when there are many cases in the community.  All studies indicate that in-person learning is the best model for effective learning – our schools have proven to be a safe and structured environment where this can occur.

72.     Since Defendants Order, counties surrounding Montgomery County have issued their own responses to rising COVID-19 cases in their region.  The City of Philadelphia issued a draconian shut-down to extend through the end of 2020 which prohibited all indoor dining, limited to 10% occupancy all outdoor dining, and closed all school sports, gyms, museums, libraries, colleges, and high schools. Nonetheless, the City of Philadelphia allowed Pre-K, elementary, and middle schools to remain open.

73.     Just like Philadelphia City, neighboring Bucks County continues to allow in person learning for elementary age students notwithstanding their implementation of other COVID-related limitations.

## <u>COUNT I</u>
**Violation of the Free Exercise Clause under the First Amendment
of the Constitution of the United States of America
42 U.S.C. §§ 1983 and 1988**

74.     The averments contained in Paragraphs 1 through 73 are incorporated herein by reference as if fully set forth.

75.     During the Board Meeting on November 12, 2020, one attendee Michel Masters, MPH, Division Director, Communicable Disease Control & Prevention introduced the proposed Order and stated that "[s]ocial gatherings and sports are the vector of transmission, currently" and that "[s]chool setting is a low risk of transmission" due to preventative measures in Montgomery County schools.  Indeed, the Board acknowledged in its Order that "[t[]he majority of spread is associated with private social gatherings and recreational sports."

76.     Yet still, notwithstanding the clear recognition that schools were not a source of spread of COVID-19 in Montgomery County, the Board opted to close only schools, leaving documented super-spreader sites such as casinos, libraries, daycare centers, gyms, bars, restaurants and other non-religious businesses and operations to remain open and operational on an in-person basis.

77.     Defendants Order is not supported by any scientific research or data that would further Defendants' stated interest in preventing the spread of the COVID-19 virus.

78.     There is no basis to conclude that there is a greater correlation between the operation of a school and the spread of the COVID-19 virus versus the operation

of a casino, library, daycare center, gym, bar, restaurant or other non-religious businesses.

79.     Further, Defendants' Order does not differentiate between Plaintiffs schools, the size and nature of their operations, their COVID-19 prevention protocols versus the same information related to the operation of a casino, library, daycare center, gym, bar, restaurant or other non-religious businesses.

80.     Accepted medical and other research data clearly demonstrates that closing schools and forcing children to return to virtual learning has tremendous negative impacts on the physical, mental, and emotional health of the children and their families.   These repercussions could be long-lasting and could result in significant problems.

81.     "A law burdening religious conduct that is not both neutral and generally applicable, however, is subject to strict scrutiny."   *Agudath Israel of America v. Cuomo, __ F.3d __ (2d. Cir. 2020) quoting, Cent. Rabbinical Cong. Of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene, 763 F.3d 183, 193 (2d. Cir. 2014), citing Lukumi, 508 U.S. at 531-32, 113 S.Ct. 2217.*

82.     "A law is not neutral and generally applicable unless there is 'neutrality between religion and non-religion.'" *Roberts v. Neace, 958 F.3d 409, 415 (2020), citing, Colo. Christian Univ. v. Weaver, 534 F.3d 1245, 1260 (10th Cir. 2008).*

*83.*   "And a law can reveal a lack of neutrality by protecting secular activities more than comparable religious ones." *Roberts at 415, citing, Hartmann v. Stone, 68 F.3d 973, 978 (6th Cir, 1995).*

84.   Defendants' Order is "not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it." *Cent. Rabbinical supra. at 197.*

*85.*   To justify its treatment of Plaintiffs, Defendants must show that their Order is "justified by a compelling governmental interest" and "narrowly tailored to advance that interest." *Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U. S. 520, 531–532 (1993).*

86.   Defendants' Order does nothing to further the interest of reducing the spread of the COVID-19 Virus.  To the contrary, Defendants' Order violates the rights of Plaintiffs, who have done an exceptional job of limiting and preventing the spread of COVID-19 with the schools, while permitting other businesses and activities continue despite the evidence that those businesses and activities are responsible for the spread of COVID-19 in Montgomery County.

87.   Defendants' Order is plainly arbitrary and capricious in violation of Plaintiffs' rights under the Free Exercise Clause of the First Amendment of the United States Constitution.

WHEREFORE, Plaintiffs request this Court to enter judgment in its favor declaring that the Order issued by the Montgomery County Office of Public Health and the Montgomery County Board of Health on November 13, 2020 closing all schools in Montgomery County Pennsylvania from November 23, 2020 until December 6, 2020 violates Plaintiff's rights under the Free Exercise Clause of the First Amendment to the United States Constitution.

### COUNT II
**Violation of the Substantial Due Process Rights
under Fourteenth Amendment of the United States Constitution
42 U.S.C. §§ 1983 and 1988**

88.     The averments contained in Paragraphs 1 through 87 are incorporated herein by reference as if fully set forth.

89.     The Fourteenth Amendment to the Constitution forbids Defendants from depriving anyone of life, liberty, or property without due process of law.

90.     The substantive component of the Due Process Clause guarantees that "all fundamental rights comprised within the term "liberty" are protected by the Federal Constitution from invasion by the States."

91.     The United States Supreme Court has stated,

"For the words "liberty" and "property" in the Due Process Clause of the Fourteenth Amendment must be given some meaning.  While this Court has not attempted to define with exactness the liberty . . . guaranteed [by the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage

26

in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Meyer* v. *Nebraska,* 262 U.S. 390, 399. In a Constitution for a free people, there can be no doubt that the meaning of "liberty" must be broad indeed. See, *e. g., Bolling* v. *Sharpe,* 347 U.S. 497, 499-500; *Stanley* v. *Illinois,* 405 U.S. 645." *Board of Regents v. Roth, 408 U.S. 564, 572 (1972).*

92.     "Where fundamental rights or interests are involved, a state regulation limiting these fundamental rights can be justified only by a compelling state interest and legislative enactments must be narrowly drawn to express only the legitimate state interests at stake." *Alexander v. Whitman, 114 F.3d 1392, 1403, (3d Cir.1997), citing, Board of Regents v. Roth, 408 U.S. 564, 572, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972), quoting, Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042 (1923); and, citing, Roe v Wade, 410 U.S. 113, 154, 93 S.Ct. 705, 727, (1973).*

93.     Notwithstanding the clear scientific data and research that schools are not a source of the spread of COVID-19, Defendants opted to close only schools, leaving documented super-spreader sites such as casinos, libraries, daycare centers, gyms, bars, restaurants and other non-religious businesses and operations to remain open and operational on an in-person basis.

94.     Defendants' Order is not supported by any scientific research or data that would further Defendants' stated interest in preventing the spread of the COVID-19 Virus.

95.     There is no basis to conclude that there is a greater correlation between the operation of a school and the spread of the COVID-19 virus versus the operation of a casino, library, daycare center, gym, bar, restaurant or other non-religious businesses.

96.     Further, Defendants' Order does not differentiate between Plaintiffs schools, the size and nature of their operations, their COVID-19 prevention protocols versus the same information related to the operation of a casino, library, daycare center, gym, bar, restaurant or other non-religious businesses.

97.     As such, Defendants' Order does nothing to further the interest of reducing the spread of the COVID-19 Virus.  To the contrary, Defendants' Order violates the rights of Plaintiffs, who have done an exceptional job of limiting and preventing the spread of COVID-19 with the schools, while permitting other businesses and activities continue despite the evidence that those businesses and activities are responsible for the spread of COVID-19 in Montgomery County.

WHEREFORE, Plaintiffs request this Court to enter judgment in its favor declaring that the Order issued by the Montgomery County Office of Public Health and the Montgomery County Board of Health on November 13, 2020 closing all

schools in Montgomery County Pennsylvania from November 23, 2020 until December 6, 2020 violates Plaintiff's Substantive Due Process rights under the Fourteenth Amendment to the United States Constitution.

**COUNT III**
**Violation of the Equal Protection Clause**
**under Fourteenth Amendment of the United States Constitution**
**42 U.S.C. §§ 1983 and 1988**

98.     The averments contained in Paragraphs 1 through 97 are incorporated herein by reference as if fully set forth.

99.     Under the Equal Protection clause, Section I of the Fourteenth Amendment, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." *U.S.C.A. Const. Amend. XIV, § I; City of Cleburne v. Cleburne Living Center, 473 U.S. 432 (1985).*

100.   The purpose of the Equal Protection Clause of the Fourteenth Amendment is to secure every person within a state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073 (2000).

101.   "The Equal Protection Clause 'announces a fundamental principle: the State must govern impartially,' and 'directs that all persons similarly circumstanced shall be treated alike.' Therefore, '[g]eneral rules that apply evenhandedly to all

persons within the jurisdiction unquestionably comply' with the Equal Protection Clause. Only when a state 'adopts a rule that has a special impact on less than all persons subject to its jurisdiction' does a question arise as to whether the equal protection clause is violated." Alexander v. Whitman, 114 F.3d 1392, 1403, (3d Cir.1997), quoting, *New York City Transit Authority v. Beazer, 440 U.S. 568, 587, 99 S.Ct. 1355, 1367, 59 L.Ed.2d 587 (1979); quoting, Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982), quoting, F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920).*

102.   Defendants' Order does nothing to further the interest of reducing the spread of the COVID-19 Virus.  To the contrary, Defendants' Order violates the rights of Plaintiffs, who have done an exceptional job of limiting and preventing the spread of COVID-19 with the schools, while permitting other businesses and activities continue despite the evidence that those businesses and activities are responsible for the spread of COVID-19 in Montgomery County.

WHEREFORE, Plaintiffs request this Court to enter judgment in its favor declaring that the Order issued by the Montgomery County Office of Public Health and the Montgomery County Board of Health on November 13, 2020 closing all schools in Montgomery County Pennsylvania from November 23, 2020 until December 6, 2020 violates Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter Declaratory Judgment in their favor and Order immediate relief as follows:

a. An Order and injunction prohibiting Defendants from implementing the Order issued on November 13, 2020, and schedule to take effect on Monday, November 23, 2020; and,

b. An Order declaring Defendants' Order to be in violation of the Constitution of the United States of American as more fully set further above; and,

c. In the alternative, a temporary restraining order and preliminary injunction pending final resolution of Plaintiffs' claims; and,

d. Awarding Plaintiffs' reasonable legal fees, costs and expenses under 42 U.S.C. §§ 1983 and 1988; and,

e. All other relief for which Plaintiffs may be entitled and which the Court deems appropriate.

Respectfully Submitted,

Dated: <u>November 20, 2020</u>      <u>/s/ Thomas E. Breth</u>
Thomas E. Breth - PA. I.D. No. 66350

DILLON MCCANDLESS KING
COULTER & GRAHAM, LLP
128 WEST CUNNINGHAM STREET
BUTLER, PA 16001
(724) 283-2200
TBRETH@DMKCG.COM
*Counsel for Plaintiffs*