## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| JOHN MARK NIEHLS, | : | No. _____ |
| ELIZABETH WEIR, and ANDREW | : | |
| AND KATE AMRHEIN, | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | BRIEF IN SUPPORT OF |
| | : | PLAINTIFFS' MOTION |
| v. | : | FOR INJUNCTIVE RELIEF AND |
| | : | TEMPORARY RESTRAINING |
| | : | ORDER |
| MONTGOMERY COUNTY | : | |
| OFFICE OF PUBLIC HEALTH | : | |
| and MONTGOMERY COUNTY | : | |
| BOARD OF HEALTH, | : | |
| | : | |
| *Defendants*. | : | |

---

### PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF AND TEMPORARY RESTRAINING ORDER

AND NOW come Plaintiffs, John Mark Niehls, Elizabeth Weir, and Andrew and Kate Amrhein, by and through their counsel, Dillon McCandless King Coulter & Graham, per Thomas E. Breth, Esquire, allege and state the following facts in support of their causes of action against Defendants the Montgomery County Office of Public Health and the Montgomery County Board of Health stating as follows:

## I.   INTRODUCTION

This case is brought to challenge an Order of the Montgomery County Board of Health ("the Board") which—in explicit contradiction of acknowledged facts regarding the safety of schools—mandates the immediate closure of all schools in the County ("the Order").   The Order is internally inconsistent, inasmuch as it explicitly acknowledges that schools are ***not*** sources of COVID infection.

In the face of this clear principle, the Board's determination to shutter the County's schools is arbitrary and capricious and a denial of due process.   That arbitrariness is all the more blatant because the Board has left open a multitude of other public and commercial facilities, populated by adults who are much more likely to become infected with and to transmit COVID-19.   This includes not only stores but casinos, retail stores, bars, restaurants, gyms, and extra-curricular sports —all known super-spreader sites.

Finally, the impact of the Order on children in our County is immense and destructive. Schools provide an essential source of meals and nutrition, health care including behavioral health support, physical activity, social interaction, and other vital resources for healthy development. School is also a safe haven for those children that suffer from sexual, psychological, or physical abuse in the home.

Moreover, the impact on students with special needs is particularly grave, and the Order's irrationality that much more inexcusable.   "With the closure of special

schools and day care centers these [special needs] children lack access to resource material, peer group interactions and opportunities of learning and developing important social and behavioral skills [which] in due time may lead to regression to the past behavior as they lose an anchor in life, as a result of this, their symptoms could relapse."  J. Lee, *Mental health effects of school closures during COVID-19*, LANCET. CHILD ADOLESC. HEALTH, S2352-4642(20)30109-7, available at https://tinyurl.com/y6k2akth.

The Order's incompatibility with existing Pennsylvania policy is illustrated not only by its inconsistency with the regulations imposed by other nearby counties, and not only with a raft of research, but also with public statements made within the last few days by the Center for Disease Control ("CDC"), the Commonwealth's Governor and Philadelphia's premier Children's hospital.

On November 19, 2020, the CDC Director Dr. Robert Redfield stated that K-12 schools should remain open because data shows that schools are among the "safest places" that kids can be from the pandemic and attempts to close schools are nothing more than an "emotional response."

https://www.dailywire.com/news/cdc-director-schools-among-safest-places-kids-can-be-closing-schools-an-emotional-response-not-backed-by-data

CDC Director Redfield went on to state "Today, there's extensive data that we have—we've gathered over the last two to three months—that confirm that K-

12 schools can operate with face-to-face learning and they can do it safely and they can do it responsibly…" *Id.*   The extensive data referenced by CDC Director Redfield further shows that "The infections that we've identified in schools when they've been evaluated were not acquired in schools. They were actually acquired in the community and in the household." *Id.*

Pennsylvania Governor, Thomas Wolf, joined with the Governors of New York, New Jersey, Delaware, Connecticut, Rhode Island and Massachusetts, to release a joint public statement, to wit:



*Medical research as well as the data from Northeastern states, from across the country, and from around the world make clear that in-person learning is safe when the appropriate protections are in place, even in communities with high transmission rates. In-person learning is the best possible scenario for children, especially those with special needs and from low-income families. There is also growing evidence that the more time children spend outside of school increases the risk of mental health harm and affects their ability to truly learn.*

New Jersey Governor Phil Murphy • New York Governor Andrew Cuomo • Pennsylvania Governor Tom Wolf • Delaware Governor John Carney • Connecticut Governor Ned Lamont • Rhode Island Governor Gina Raimondo • Massachusetts Governor Charlie Baker

Likewise, a local policy-based think-tank, CHOP PolicyLab—an organization upon whom the Montgomery County Board of Health explicitly relied—has since revised its guidance to schools.  On November 20, 2020, CHOP PolicyLab noted:

> Community mitigation efforts—principally gathering size limitations, restaurant/bar restrictions and enforcement—should precede any

> alteration to plans for in-school learning, which should be a last resort
> . . . since younger children are less susceptible to symptomatic
> infection, remain in more consistent cohorts, are likely more compliant
> with in-school safety protocols, and do not have the wider network of
> social contacts through sports and other activities that older youth do,
> elementary school and child care could remain in-person.

Children's Hospital of Philadelphia PolicyLab, *COVID-19 Outlook: Finding Safe*

*Harbor, While Looking Forward*, *available at* https://tinyurl.com/y5w6dkjp.

These pronouncements are founded on what is by now a scientific consensus

that school attendance during the pandemic is good for, rather than a danger to,

young people, particularly those with special needs.  Studies have noted that stay-at-

home conditions

> [T]rigger outburst of temper tantrums, and conflict between parents and
> [special-need] adolescents. Although prior to the pandemic these
> children had been facing difficulties even while attending special
> schools, but in due course they had learnt to develop a schedule to
> adhere to for most of the time of the day. To cater to these challenges,
> it is difficult for parents to handle the challenged children and
> adolescents on their own, as they lack professional expertise and they
> mostly relied on schools and therapists to help them out.

S. Singh et al, *Impact of COVID-19 and lockdown on mental health of*

*children and adolescents: a narrative review with recommendations*,

Psychiatry Res. 2020, available at https://tinyurl.com/y4mn8guh.

Finally, the irrationality of the Board's Order is made clear by the fact that,

while infection rates have been rising in the Commonwealth for several weeks, the

Plaintiff school and many other similar institutions have successfully developed and

imposed regimens that have kept infection rates in schools—both for students and for faculty—at very low levels. Indeed, most schools have maintained single digit infection rates among student bodies that number in the hundreds.  This broad experience was, for no identifiable reason, completely ignored by the Board when it entered the Order at issue.  Yet this experience demonstrates that the blunderbuss Order closing all schools was totally unnecessary as well as completely ineffective. For all of the aforementioned reasons, Plaintiffs implore this Court to issue a temporary restraining order immediately enjoining Defendants from enforcing its Order.

## II.   FACTS

The Commonwealth has responded to the COVID pandemic by imposing periodic closures of schools, as well as closures of other commercial, public and private institutions.

### A. Schools in Montgomery County Prepare for the 2020-2021 School Year

In preparation for the 2020-2021 school year, many schools took extraordinary steps to prepare to open in-person with special protocols aimed to prevent the spread of COVID in schools, hired medical staff for the schools and put in place special boards and committees to respond to questions around COVID, positive cases within the schools and changes to protocols throughout the school year.  At an evidentiary hearing, Plaintiffs will show that its school, like many others, required face masks for all students and staff, physical distancing six feet apart, dividing classes into small cohorts that have minimal

interaction with each other, screening of students, staff, and visitors prior to entering campus every day, and hand hygiene as well as disinfecting protocols.

Prior to opening school, Plaintiffs' school and the schools like it made the strategic decision to suspend all in-person extra-curricular activities, including sports teams, for the entire 2020-2021 school year. Many schools also have reworked their facilities to contribute to success. These institutions have large facilities that allow for more than six feet of distance between students in classrooms, that allows for groups of students to maintain their own bathrooms, and that are equipped with facilities that exceed the recommended ASHRAE standards for quality indoor ventilation. In addition, some schools also provide hospital grade PPE to any teacher who requests it, plastic around the teachers' desks, and provides teachers with financial support for testing if anyone in their household requires it. Moreover, some schools also have equipped classrooms with video conferencing equipment that allows teachers who have to temporarily quarantine at home to teach remotely, while providing students with a safe and effective atmosphere for learning.

Many schools have appointed their own contract tracers that are in contact with the Montgomery Board of Health and have developed relationships with local area hospitals to schedule same or next day testing for households within the school. These schools have also subsidized the cost of testing when needed and are exploring

plans to transition to vendors who can provide PCR testing kits for diagnostic testing with 48 to 36 hour turn-around results.

Importantly, these extensive steps have yielded the desired result:  the schools that have implemented such protocols have not experienced any material outbreak of COVID-19. Indeed, some schools have had no cases at all, others have had single digits, and many that have had exposures have determined that transmission occurred out-of-school. These schools also have crafted strict quarantine and isolation protocols in response to even a singular incident of COVID-19 and have thus found to have no incidences of in-school transmission.

Student and parent handbooks from these schools generally provide detailed logistics around the school day, including busing, arrival and dismissal and rules around remaining at home in case of symptoms or contact and returning to school after symptoms, exposure or travel.  To date, these schools have followed these rules and procedures carefully, which has allowed it to successfully prevent COVID transmission and outbreaks within those schools.

The Board's decisions-making process completely ignored both the steps taken by private schools to achieve these results, and the important results themselves.

**B.  The Special Meeting of the Montgomery County Board of Health**

On or about Tuesday, November 10, 2020, the Board posted a "special meeting notice" on its designated portion of the Montgomery County municipal website. Moreover, a Twitter handle affiliated with the Montgomery County Office of Public Health posted a tweet stating that: "There will be a Special Montgomery County Board of Health Meeting held virtually on Thursday, November 12, 2020 at 10am.  To get the Zoom link, please confirm your participation by sending your name, phone number and e-mail address to Toyca Williams, twilliams@montcopa.org."  Neither the tweet nor the posted notice identified the nature of the special meeting.  Immediately thereafter, the Twitter handle affiliated with the Montgomery County Office of Public Health posted a tweet stating that: "Due to the anticipated high volume of people seeking to make public comment, a time limit of 2 minutes will be strictly enforced per speaker. Submit comments to publichealth@montcopa.org by 4pm today. These will be reflected in the final adopted Board Minutes of the meeting."  The agenda for the Board's special meeting posted on a different part of the Board's website, included a line item for "Montgomery County School Risk Reduction and Mitigation Order" but made no mention of what would be discussed with any specificity.  The only way to access the meeting was to email one person from the Office to request login information. Many who requested login information did not receive a response.

On or about Thursday, November 12, 2020 at 10:00 a.m., the Board convened a meeting by Zoom.  The meeting was attended by the Board and approximately 500 other attendees, the maximum allowed by Zoom.  The precise number of individuals who sought to attend the meeting is unknown; attendance was capped at 500.  Upon information and belief, many citizens were unable to access the Zoom, and resorted to logging in to watch the meeting via news sources.

At the hearing, members of the Board made clear from the outset their position that schools in Montgomery County were not the primary source of spread.  Indeed, Michel Masters, Division Director, Communicable Disease Control & Prevention, noted that "social gatherings and sports are the vector of transmission currently" and that "school setting is a low risk of transmission."  Likewise, Chairman of the Board Michael Laign specified that the primary increase in cases in Montgomery County was due to "gatherings."  Following other similar statements by members of the Board, the meeting was opened for public comment limited to two minutes per speaker.  Around one hundred members of the public requested to comment.  However, only fifty members of the public were permitted to speak; statements came from local doctors, lawyers, parents, school administrators, and citizens.  Overwhelmingly, the public comment at the hearing evidenced a recognition of the deep harm caused by the spread of COVID-19 but an overwhelming distaste for a one-size-fits-all closure of schools.  Speakers noted the undeniably negative impact

the Governor's School Closure Order had on children, the time, effort, and money that went into preparing schools to safely reintroduce students to schools, and the inequality caused to students whose schools cannot afford and/or are unable to provide virtual education.  Speakers also queried the rationality of closing schools before closing known super-spreader sites like bars and public gyms, particularly when the Board itself explicitly acknowledged that schools are not the vector of spread in the county.

On or around 12:30 p.m., Chairman Laign indicated that the public comment period was closed, despite the requests by many members of the public to address the Board and attempting to do so.  Chairman Laign declined to deliberate with the Board regarding its decision to the Proposed Order. Instead, with no deliberation, he indicated that he would reconvene the meeting later that day or the following day and in response, attendees expressed their disappointment.  Without a set time to reconvene, the attorney for the Board, Lauren Ashley Hughes, demanded that Chairman Laign schedule a time for a continuation.  Upon information and belief, the Board then used Zoom's mute function to silence the public.  With agreement of the Board, Chairman Laign adjourned the meeting until less than 24-hours later, to noon on Friday, November 13, 2020.

Upon information and belief, following the meeting, several local physicians sent a letter to the Board in advance of the Board's follow-up meeting as medical

professionals who are parents of students of local schools that had spent countless hours and substantial resources implementing policies at their school to ensure that students could return safely.  The letter pleaded with the Board to pursue other mitigation efforts before forcing closure of schools in Montgomery County that have been diligent and successful in their approach to mitigating the spread of COVID-19.  Indeed, the letter noted that "Governor Wolf and Health Secretary Dr. Levine have both indicated that the Commonwealth will not close schools again."  No response was received.

### C. The Board of Health Holds a Follow-up Meeting

The following day, on Friday, November 13, 2020, the Board reconvened the meeting via FacebookLive only, with no allowance of any public participation.  The technology the Board chose does not permit public participation.  The Board did not deliberate on the record, but announced its decision to require all schools, public and private, in Montgomery County to support virtual learning only between November 23, 2020 until December 6, 2020 ("the Order").  It voted, 5-0, on an Order that was different from that which some members of the public were able to comment on the previous day, the Proposed Order.  No rationale was provided for the Order.

### D. Impact of School Closure on Children

NAME, the Director the Centers for Disease Control, said at a press conference yesterday that "CHECK QUOTE school is one of the safest places for kids to be" during

the pandemic.  That is true both physically and emotionally.  Depriving children of school deprives them of that safety.

Numerous Studies have found that, during the time of the School Closure Order, children of all ages demonstrated increased irritability and inattention than their school-going peers as well as disturbed sleep, nightmares, poor appetite, agitation, and separation related anxiety.  Other studies found that home confinement of children and adolescents was associated with uncertainty and anxiety attributable to disruption in their education, physical activities and opportunities for socialization, and that the absence of structured setting of the school for a long duration result in disruption in routine, boredom and lack of innovative ideas for engaging in various academic and extracurricular activities.  Indeed, research demonstrated that many children have expressed lower levels of affect for not being able to play outdoors, not meeting friends and not engaging in the in-person school activities and that these children have become more attention seeking and more dependent on their parents due to the long term shift in their routine.  Finally, some studies have presumed that children might resist going to school after the lockdown is over that these children may face difficulty in establishing rapport with their mentors after the schools reopen. Consequently, these studies conclude, the constraint of movement imposed on them can have a long term negative effect on their overall psychological well-being.

Studies have also emphasized the even greater impact that the Stay At Home Order and School Closure Order has had on children with special needs: "With the closure of

special schools and day care centers these children lack access to resource material, peer group interactions and opportunities of learning and developing important social and behavioral skills in due time may lead to regression to the past behavior as they lose anchor in life, as a result of this their symptoms could relapse." In turn, these studies note that "[t]hese conditions also trigger outburst of temper tantrums, and conflict between parents and adolescents. Although prior to the pandemic, these children had been facing difficulties even while attending special schools, but in due course they had learnt to develop a schedule to adhere to for most of the time of the day. To cater to these challenges, it is difficult for parents to handle the challenged children and adolescents on their own, as they lack professional expertise and they mostly relied on schools and therapists to help them out."

Schools also provide an essential source of meals and nutrition, health care including behavioral health supports, physical activity, social interaction, supports for students with special education needs and disabilities, and other vital resources for healthy development. Sharfstein JM, Morphew CC. *The urgency and challenge of opening K-12 schools in the fall of 2020*, JAMA. 2020;324(2):133-134. doi:10.1001/jama.2020.10175; Esposito S, Principi N. *School closure during the coronavirus disease 2019 (COVID-19) pandemic: an effective intervention at the global level?*, JAMA Pediatr. Published online May 13, 2020. doi:10.1001/jamapediatrics.2020.1892.

Plaintiffs' children and all others in the County will, if the Order remains in force, be completely unable to interact with their peers and their teachers, and will not receive a proper education or religious instruction.   In April of 2020, the Brookings Institute quantified the very significant long-term impact of lost earnings on young people and the future global economy of school closures. It emphasizes that "when children lose out on education, they lose out on future opportunities including economic benefits, such as additional earnings, with far-reaching consequences" and concludes that "[f]or whole societies closing down education today, there will likely be significant consequences tomorrow." George Psacharopoulos, Harry Patrinos, Victoria Collis, and Emiliana Vegas, *The COVID-19 cost of school closures*, Brookings (April 29, 2020), *available at* https://tinyurl.com/y72ks3qa.

> We begin by assuming that every additional year of schooling equates to 10 percent in additional future earnings. We then use the number of months of education closures to estimate the loss in marginal future earnings. For example, if Country X closes its schools and universities for four months, the loss in marginal future earnings would be 2.5 percent per year over a student's working life. We apply this assumption to the world's largest economy, the United States of America and its 76 million students, as our starting point. We model on a 45-year working life, a discount rate of 3 percent, and mean annual earnings of $53,490.
>
> This quick estimate suggests lost earnings of $1,337 per year per student: a present value loss of earnings of $33,464 (63 percent of a year's salary at current average wage rates). While this may

not sound like too much of an individual price for young people to pay in the fight against COVID-19, a look at the impact on the whole of the country is much more sobering.

In this model, the cost to the United States in future earnings of four months of lost education is $2.5 trillion—12.7 percent of annual GDP. And with well over half the country's states deciding to keep schools and universities closed until the fall at the earliest, much of this loss may well materialize. Extrapolating to the global level, on the basis that the U.S. economy represents about one-quarter of global output, these data suggest the world could lose as much as $10 trillion over the coming generation as a result of school closures today. *Id.*

Moreover, although home should be the safest place for a child, sexual, psychological and physical abuse can occur. Since COVID emerged and lockdowns have been instituted, rates of domestic violence and partner abuse have increased globally impacting women and children most often. Bradbury-Jones C, Isham L. T*he pandemic paradox: the consequences of COVID-19 on domestic violence*. J Clin Nurs. 2020;29(13-14):2047-2049. Likewise, school is a place that many students receive nutritional assistance from the state. School is a place of safety for our children, and a portion of them will be harmed by being forced to stay at home.

School closures also affect parents' ability to work. One analysis estimated that a 12-week school closure could cost the US $128 billion in lost productivity, including a 19% reduction in work hours among health care personnel. Lempel  H,

Epstein  JM, Hammond  RA.  *Economic cost and health care workforce effects of school closures in the US*.  PLoS Curr. 2009;1:RRN1051.

### E. The Order at Issue was Inconsistent with those from Surrounding Counties

Before the Order was issued, schools throughout the Commonwealth were permitted to reopen provided they met the criteria established by the Pennsylvania Department of Health, the Pennsylvania Department of Education, and guidance issued by local municipalities.  Some schools throughout the state voluntarily decided to delay reopening and/or transition to a virtual only or hybrid part-virtual-part-in-person model.  No private schools in the Commonwealth of Pennsylvania were ordered to suspend in-person classes. Thus, private schools and parents were free to decide on their own whether they were able to shoulder the responsibility of maintaining a safe learning environment for its students.

Before the Order was issued, on November 13, 2020, Bucks County indicated that "As you have seen this week, PDE and Chop Policy center in Philadelphia, have recently made the suggestion to move to all virtual learning now that transmission is labeled as 'substantial.' **The Bucks County Department of Health unconditionally recommends not to change the model of instruct for your school districts to virtual at this time**." The Bucks County Department of Health also noted:

-There is no existing evidence, anywhere, indicating that in-person schooling contributes to spread in the community.  Likewise, there is no evidence that closures alone will slow spread in the community.
-When a school's health and safety plan is followed, we have not seen any evidence of in-school spread, either to other students or staff.  This doesn't mean it won't ever happen.  But it does mean that our school district health safety plans are extremely effective.
-More than 450 children and staff have been quarantined from close exposures to cases in school, with no positive cases resulting from those exposures.
-Cases brought to school have been traced to exposures outside of school, most commonly household contacts and social gatherings – situations where the involved cases were not masking appropriately.  These exposures will continue to occur regardless of a school's status.
-Almost 40% of our cases have occurred in students and staff that were in full virtual mode at the time of infection.
-We have had more than 1200 cases in Bucks County children with only mild disease so far; none have been hospitalized or severely ill.  While it's clearly not impossible to occur, the numbers indicate it's very rare.

The current data indicates that, because of our strong school health and safety plans, children and teachers are safe in our schools, even when there are many cases in the community.  All studies indicate that in-person learning is the best model for effective learning – our schools have proven to be a safe and structured environment where this can occur.

Since the Order was issued, counties surrounding Montgomery County have issued their own responses to rising COVID-19 cases in their region. The City of Philadelphia issued a draconian shut-down to extend through the end of 2020 which prohibited all indoor dining, limited to 10% occupancy all outdoor dinings, and closed all school sports, gyms, museums, libraries, colleges, and high schools.  But even after having imposed these very strict limitations, **the City of Philadelphia allowed Pre-K, elementary, and middle schools to remain open**.  Just like Philadelphia City, neighboring Bucks County continues to allow in person learning for elementary age students notwithstanding their implementation of other COVID-related limitations.

Likewise, since the Order was issued by the Montgomery County Board of Health, Governor Tom Wolf has made clear his administration's distaste for school closure, noting:



*Medical research as well as the data from Northeastern states, from across the country, and from around the world make clear that in-person learning is safe when the appropriate protections are in place, even in communities with high transmission rates. In-person learning is the best possible scenario for children, especially those with special needs and from low-income families. There is also growing evidence that the more time children spend outside of school increases the risk of mental health harm and affects their ability to truly learn.*

New Jersey Governor Phil Murphy • New York Governor Andrew Cuomo • Pennsylvania Governor Tom Wolf • Delaware Governor John Carney • Connecticut Governor Ned Lamont • Rhode Island Governor Gina Raimondo • Massachusetts Governor Charlie Baker

Likewise, a local policy-based think-tank, CHOP Policy Lab—an organization upon whom the Montgomery County Board of Health explicitly relied—has since revised its guidance to schools.  On November 20, 2020, CHOP PolicyLab noted:

> Community mitigation efforts—principally gathering size limitations, restaurant/bar restrictions and enforcement—should precede any alteration to plans for in-school learning, which should be a last resort . . . since younger children are less susceptible to symptomatic infection, remain in more consistent cohorts, are likely more compliant with in-school safety protocols, and do not have the wider network of social contacts through sports and other activities that older youth do, elementary school and child care could remain in-person.

Children's Hospital of Philadelphia PolicyLab, *COVID-19 Outlook: Finding Safe Harbor, While Looking Forward*, *available at* https://tinyurl.com/y5w6dkjp.

## III.   A TEMPORARY RESTRAINING ORDER SHOULD ISSUE AGAINST DEFENDANTS

Plaintiffs satisfy the requirements necessary for injunctive relief because:  (1) Plaintiffs have made a strong showing that they are likely to prevail on the merits of

its claims against Defendants for declaratory judgment and injunctive relief; (2) Plaintiffs will suffer irreparable harm if Defendants are permitted to continue to enforce its unconstitutional Order; (3) the balance of the equities favors entering the injunction against Defendants; and (4) invalidating the Order is in the public's interest. *See Kos Pharmaceuticals, Inc. v. Andrx Corp*., 369 F.3d 700, 708 (3d Cir. 2004); *Vector Sec., Inc. v. Stewart*, 88 F. Supp. 2d 395, 399 (E.D. Pa. 2000).

### A. Plaintiffs are likely to succeed on the merits of its claim that Defendant's Order closing school is unconstitutional.

In considering a preliminary injunction request, a court must consider whether the movant has shown "a reasonable probability of success on the merits." *Saudi Basic Indus. Corp. v. Exxon Corp*., 364 F.3d 106 (3d Cir. 2004); *Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. Napolitano*, 85 F. Supp. 2d 491 (E.D. Pa. 2000). To demonstrate a reasonable likelihood of prevailing, a movant need not establish an absolute certainty of success, only a reasonable probability. *SK&F Co. v. Premo Pharmaceutical Laboratories, Inc*., 625 F.2d 1055, 1066-67 (3d Cir. 1980). In this case, Plaintiffs can show far more than a reasonable probability of success against Defendants.

### 1. The School Closure Order Violates Substantive Due Process and Equal Protection.

The Supreme Court has recognized that the "core of the concept" of substantive due process is the protection against arbitrary government action. *County*

*of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (citing *Hurtado v. California*, 110

U.S. 516, 527 (1884)).  Indeed, "the touchstone of due process is protection of the

individual against arbitrary actions of government . . ." *Id*. Rational basis review is

a forgiving standard for government acts, but it "is not a toothless one . . ." *Mathews*

*v. Lucas*, 427 U.S. 495, 510 (1976).  As a general matter, the rational basis test

requires only that the governmental action "bear[ ] a rational relationship to some

legitimate end."  *Romer v. Evans*, 517 U.S. 620, 631 (1996).  Conversely, actions

which are irrational, arbitrary or capricious do not bear a rational relationship to any

end. *Cty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 169 (3d. Cir. 2006)

(quoting *Pace Resources, Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1035 (3d Cir.

1987)) ("Thus, for appellants' facial substantive due process challenge to the

Ordinance to be successful, they must 'allege facts that would support a finding of

arbitrary or irrational legislative action by the Township.'").  Even with this

forgiving standard as its guide, it is clear that the Order violates substantive and

procedural due process and equal protection.

　　　Our Supreme Court further summarized the scope of rational basis scrutiny in

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile*

*Insurance Co.* as follows:  "The scope of review under the arbitrary and capricious

standard is narrow and a court is not to substitute its judgment for that of the agency.

Nevertheless, the agency must examine the relevant data and articulate a satisfactory

explanation for its action including a rational connection between the facts found and the choice made . . ." 463 U.S. 29, 43 (1983).

Like substantive due process, the Equal Protection Clause forbids state actors to "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. 14th Amend.  Where a plaintiff in an equal protection claim does not allege that distinctions were made on the basis of a suspect classification such as race, nationality, gender or religion, the claim arises under the "class of one" theory. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). To prevail on such a claim, the plaintiff must demonstrate that : (1) Defendants treated him or her differently than others similarly situated, (2) Defendants did so intentionally, and (3) there was no rational basis for the difference in treatment.  *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d. Cir. 2006). As explained above, the rational basis test is forgiving, but not without limits in its deference.  Distinctions cannot be arbitrary or irrational and pass scrutiny. "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446 (1985); *see also Heisler v. Thomas Colliery Co*., 260 U.S. 245 (1922) (finding that treating people differently under the law must rest upon some ground of difference which justifies the classification and has a fair and substantial relationship to the object of the legislation).

During the Board's meeting on November 12, 2020 at which the Board discussed the Order at issue, one attendee Michel Masters, MPH, Division Director, Communicable Disease Control & Prevention introduced the proposed Order and stated that "[s]ocial gatherings and sports are the vector of transmission, currently" and that "[s]chool setting is a low risk of transmission" due to preventative measures in Montgomery County schools.  Indeed, the Board acknowledged in its Order that "[t[]he majority of spread is associated with private social gatherings and recreational sports."  Yet still, notwithstanding the clear recognition that schools were not a source of spread of COVID-19 in Montgomery County and notwithstanding the overwhelming evidence of the damage caused to young students who are forced to stay home, the Board opted to close only schools, leaving documented super-spreader sites such as casinos, public gyms, bars, restaurants, and indoor dining open. The Board did not indicate that any data supported this conclusion and provided no basis to conclude that there was any rational connection between the facts found and the choice made.

Furthermore, the Board did not differentiate between schools based on factors such as school size, class size, space on campus, COVID prevention protocols and data related to COVID-19 cases of students or teachers at the schools.  As well documented over the last several months, closing schools and forcing children to return to virtual learning has tremendous negative impacts on the physical, mental,

and emotional health of the children and their families.  These repercussions could be long-lasting and could result in significant problems.  Yet, still, schools enacted countless policies and protocols and spent countless hours implementing social distancing policies within its walls which prevent the spread of COVID-19.  Indeed, these schools have done so successfully.  Thus, the Board's one-size-fits-all Order is plainly arbitrary and capricious in violation of Plaintiff's substantive due process and equal protection rights.

### 2. The School Closure Order Violates the Free Exercise Clause.

During the Board Meeting on November 12, 2020, one attendee Michel Masters, MPH, Division Director, Communicable Disease Control & Prevention introduced the proposed Order and stated that "[s]ocial gatherings and sports are the vector of transmission, currently" and that "[s]chool setting is a low risk of transmission" due to preventative measures in Montgomery County schools.  Indeed, the Board acknowledged in its Order that "[t[]he majority of spread is associated with private social gatherings and recreational sports."

Yet still, notwithstanding the clear recognition that schools were not a source of spread of COVID-19 in Montgomery County, the Board opted to close only schools, leaving documented super-spreader sites such as casinos, libraries, daycare centers, gyms, bars, restaurants and other non-religious businesses and operations to remain open and operational on an in-person basis. Defendants Order is not

24

supported by any scientific research or data that would further Defendants' stated interest in preventing the spread of the COVID-19 virus.  There is no basis to conclude that there is a greater correlation between the operation of a school and the spread of the COVID-19 virus versus the operation of a casino, library, daycare center, gym, bar, restaurant or other non-religious businesses.

Further, Defendants' Order does not differentiate between Plaintiffs schools, the size and nature of their operations, their COVID-19 prevention protocols versus the same information related to the operation of a casino, library, daycare center, gym, bar, restaurant or other non-religious businesses.  Accepted medical and other research data clearly demonstrates that closing schools and forcing children to return to virtual learning has tremendous negative impacts on the physical, mental, and emotional health of the children and their families.  These repercussions could be long-lasting and could result in significant problems.

"A law burdening religious conduct that is not both neutral and generally applicable, however, is subject to strict scrutiny."  *Agudath Israel of America v. Cuomo, __ F.3d __ (2d. Cir. 2020) quoting, Cent. Rabbinical Cong. Of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene, 763 F.3d 183, 193 (2d. Cir. 2014), citing Lukumi, 508 U.S. at 531-32, 113 S.Ct. 2217.*  "A law is not neutral and generally applicable unless there is 'neutrality between religion and non-religion.'"  *Roberts v. Neace, 958 F.3d 409, 415 (2020), citing, Colo. Christian Univ. v. Weaver,*

*534 F.3d 1245, 1260 (10th Cir. 2008).* "And a law can reveal a lack of neutrality by protecting secular activities more than comparable religious ones." *Roberts at 415, citing, Hartmann v. Stone, 68 F.3d 973, 978 (6th Cir, 1995).*

Defendants' Order is "not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it." *Cent. Rabbinical supra. at 197.*

To justify its treatment of Plaintiffs, Defendants must show that their Order is "justified by a compelling governmental interest" and "narrowly tailored to advance that interest." *Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U. S. 520, 531–532 (1993).* Defendants' Order does nothing to further the interest of reducing the spread of the COVID-19 Virus. To the contrary, Defendants' Order violates the rights of Plaintiffs, who have done an exceptional job of limiting and preventing the spread of COVID-19 with the schools, while permitting other businesses and activities continue despite the evidence that those businesses and activities are responsible for the spread of COVID-19 in Montgomery County. Defendants' Order is plainly arbitrary and capricious in violation of Plaintiffs' rights under the Free Exercise Clause of the First Amendment of the United States Constitution.

### 3. The School Closure Order Violates Procedural Due Process.

The Third Circuit has instructed that "[t]o establish a cause of action for a violation of procedural due process, a plaintiff [must prove] that a person acting under color of state law deprived [him or her] of a protected interest [and] that the state procedure for challenging the deprivation does not satisfy the requirements of procedural due process." *Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667, 680 (3d Cir.1991). A property interest protected by the due process clause results from a "'legitimate claim of entitlement' created by an independent source such as state law." *Id.* at 679 (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972)). "State law determines what constitutes 'property' for due process purposes." *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000); *see also E.B. v. Verniero*, 119 F.3d 1077, 1105 (3d Cir. 1997) ("Liberty interests that trigger procedural due process may be created by state law or by the federal constitution itself."). If such a property interest is deprived, due process requires notice and a meaningful opportunity to be heard. *Midnight Sessions*, 945 F.2d at 680. Pennsylvania law recognizes that the right to education is a statutory right. *See O'Leary v. Wisecup*, 364 A.2d 770 (Pa. Cmwlth. Ct. 1976).

Furthermore, "[p]rotected interests extend beyond merely freedom from bodily restraint but also [to] the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own

conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." *Roth*, 408 U.S. at 572 (emphasis added).

Once a protected liberty or property interest has been identified, the focus shifts to assessing the quality and timing of the process due. The test, first enunciated in *Mathews v. Eldridge*, 424 U.S. 319 (1976), requires this Court to balance three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id*. at 334-35; *accord E.B.*, 119 F.3d at 1106-07.

In this case, Defendants issued the School Closure Order without any meaningful procedural due process. Defendants failed to provide notice of the time and date of the hearing giving rise to the Order. Defendants denied entry to countless citizens by denying them the appropriate Zoom link. Defendants also failed to allow the public and those impacted by the order the opportunity to be heard, and, in fact, silenced the public by muting everyone. Thus, by depriving the children of Montgomery County the opportunity to attend in-person school instruction, the

Montgomery County Board of Health deprived them of a statutory right.  *See O'Leary v. Wisecup*, 364 A.2d 770 (Pa. Cmwlth. Ct. 1976).  By doing so without appropriate notice and a meaningful opportunity to be heard, the Board did not satisfy the requirements of procedural due process and, in so doing, violated Plaintiffs' procedural due process rights.  *See Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667, 680 (3d Cir. 1991).

"Where fundamental rights or interests are involved, a state regulation limiting these fundamental rights can be justified only by a compelling state interest and legislative enactments must be narrowly drawn to express only the legitimate state interests at stake." *Alexander v. Whitman, 114 F.3d 1392, 1403, (3d Cir.1997), citing, Board of Regents v. Roth, 408 U.S. 564, 572, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972), quoting, Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042 (1923); and, citing, Roe v Wade, 410 U.S. 113, 154, 93 S.Ct. 705, 727, (1973).*

Notwithstanding the clear scientific data and research that schools are not a source of the spread of COVID-19, Defendants opted to close only schools, leaving documented super-spreader sites such as casinos, libraries, daycare centers, gyms, bars, restaurants and other non-religious businesses and operations to remain open and operational on an in-person basis.  Defendants' Order is not supported by any

scientific research or data that would further Defendants' stated interest in preventing the spread of the COVID-19 Virus.

There is no basis to conclude that there is a greater correlation between the operation of a school and the spread of the COVID-19 virus versus the operation of a casino, library, daycare center, gym, bar, restaurant or other non-religious businesses. Further, Defendants' Order does not differentiate between Plaintiffs schools, the size and nature of their operations, their COVID-19 prevention protocols versus the same information related to the operation of a casino, library, daycare center, gym, bar, restaurant or other non-religious businesses.

As such, Defendants' Order does nothing to further the interest of reducing the spread of the COVID-19 Virus.  To the contrary, Defendants' Order violates the rights of Plaintiffs, who have done an exceptional job of limiting and preventing the spread of COVID-19 with the schools, while permitting other businesses and activities continue despite the evidence that those businesses and activities are responsible for the spread of COVID-19 in Montgomery County.

### 4. The School Closure Order Violates Equal Protection Clause.

Under the Equal Protection clause, Section I of the Fourteenth Amendment, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." *U.S.C.A. Const. Amend. XIV, § I; City of Cleburne v. Cleburne Living Center, 473 U.S. 432 (1985)*. The purpose of the Equal Protection Clause of the

Fourteenth Amendment is to secure every person within a state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073 (2000).

"The Equal Protection Clause 'announces a fundamental principle: the State must govern impartially,' and 'directs that all persons similarly circumstanced shall be treated alike.' Therefore, '[g]eneral rules that apply evenhandedly to all persons within the jurisdiction unquestionably comply' with the Equal Protection Clause. Only when a state 'adopts a rule that has a special impact on less than all persons subject to its jurisdiction' does a question arise as to whether the equal protection clause is violated." Alexander v. Whitman, 114 F.3d 1392, 1403, (3d Cir.1997), quoting, *New York City Transit Authority v. Beazer, 440 U.S. 568, 587, 99 S.Ct. 1355, 1367, 59 L.Ed.2d 587 (1979); quoting, Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982), quoting, F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920).*

Defendants' Order does nothing to further the interest of reducing the spread of the COVID-19 Virus.  To the contrary, Defendants' Order violates the rights of Plaintiffs, who have done an exceptional job of limiting and preventing the spread of COVID-19 with the schools, while permitting other businesses and activities continue despite the evidence that those businesses and activities are responsible for the spread of COVID-19 in Montgomery County.

### B. Plaintiffs will suffer irreparable harm if a temporary restraining order does not issue.

Without an immediate Order enjoining Defendants from enforcing the Order, Plaintiffs will be irreparably harmed.  "An injury is deemed irreparable if it cannot be adequately compensated by an award of damages." *Greyhound Lines, Inc. v. Peter Pan Bus Lines, Inc.*, 845 F. Supp. 295, 300 (E.D. Pa. 1994). The court can enjoin government action to enforce "an unconstitutional act, violating the Federal Constitution." *Morales v. TWA*, 504 US 374, 381 (1992).  Indeed, the enforcement of an unconstitutional order necessarily leads to a finding of irreparable harm for purposes of preliminary injunctive relief, as the harm caused by such Order cannot be recouped by money damages or a delayed injunction.

Here, the damage caused to students through an extended school closure is undeniable.  Recently, researchers have found that children who were unable to attend school because of COVID-19 closures were more likely to exhibit symptoms of clinginess, increased irritability and inattention than their school-going peers, and that they experienced disturbed sleep, nightmares, poor appetite, agitation, and separation-related anxiety. See W.Y. Jiao, L.N. Wang, J. Liu, S.F. Fang, F.Y. Jiao, M. Pettoello-Mantovani, and E. Somekh, *Behavioral and emotional disorders in children during the COVID-19 epidemic*. J. PEDIATR., S0022-3476(20)30336-X (2020), available at https://doi.org/10.1016/j.jpeds.2020.03.013; R.M. Viner, S.J. Russell, H. Croker, J. Packer, J. Ward, C. Stansfield, O. Mytton, C. Bonell, R. Booy, *School closure and management practices during coronavirus outbreaks including*

*COVID-19: A rapid systematic review*. LANCET CHILD ADOLESC. HEALTH 4 (5), 397–404, available at https://doi.org/10.1016/S2352-4642(20)30095-X. Research has also demonstrated that the absence of a structured setting, such as is provided in school, for a long duration results in reduced capacity for engaging in various academic and extracurricular activities, as well as in lower levels of affect. Some studies have predicted that, when a full return to school is initiated, children who were unable to attend due to COVID-19 distancing may resist going to school and may face difficulty in establishing rapport with their mentors. Consequently, these studies conclude, constraints of movement imposed on children—particularly exclusion from school—can have a long term deleterious effect on overall psychological well-being.  J. Lee, *Mental health effects of school closures during COVID-19*. LANCET. CHILD ADOLESC. HEALTH, S2352-4642(20)30109-7, available at https://doi.org/10.1016/S2352-4642(20) 30109-7; J.J. Liu, Y. Bao, X. Huang, J. Shi, L. Lu, L., *Mental health considerations for children quarantined because of COVID-19*. LANCET. CHILD ADOLESC. HEALTH 4 (5), 347–349, available at https://doi.org/10.1016/S2352-4642(20)30096-1; Y. Zhai, X. Du, Mental health care for international Chinese students affected by the COVID-19 outbreak.  LANCET   PSYCHIATRY   7   (4),   e22,   available   at https://doi.org/10.1016/S2215-0366(20)30089-4. According to the Brookings Institute, preliminary estimates suggest that students' learning gains could fall by

roughly 70% after extended COVID-distancing, resulting in significant reductions in long-term academic achievement.  Jim Soland, Megan Kuhfeld, Beth Tarasawa, Angela Johnson, Erik Ruzek, and Jing Liu, *The Impact of COVID-19 on Student Achievement and What it may Mean for Educators* (May 27, 2020), available at https://www.brookings.edu/blog/brown-center-chalkboard/2020/05/27/the-impact-of-covid-19-on-student-achievement-and-what-it-may-mean-for-edu%E2%80%A.

Early research into the impact of school closures on children also demonstrates that as the percent of people at home sharply increase, there was a corresponding 12 percent increase in domestic violence and a marked increase in the rate of first-time child abuse.  Likewise, researchers have also cautioned about other non-obvious externalities associated with long-term school absences due to COVID-distancing: malnutrition and an inability to obtain medical care including a possible COVID vaccine.  Results of those studies recommend "an urgent need to quantify the physical and psychological burdens of prolonged lockdown policies." Sanga, Sarath and McCrary, Justin, T*he Impact of the Coronavirus Lockdown on Domestic Violence* (May 28, 2020), available at https://ssrn.com/abstract=3612491 or http://dx.doi.org/10.2139/ssrn.3612491. Studies have also highlighted the acute impact that school closure has had on children with special needs: "With the closure of special schools and day care centers these children lack access to resource material, peer group interactions and opportunities of learning and developing

important social and behavioral skills [which] in due time may lead to regression to the past behavior as they lose an anchor in life, as a result of this, their symptoms could relapse."  J. Lee, *Mental health effects of school closures during COVID-19*, LANCET. CHILD ADOLESC. HEALTH, S2352-4642(20)30109-7, available at https://www.thelancet.com/journals/lanchi/article/PIIS2352-4642(20)30109-7/fulltext.  In turn, these studies note that "[t]hese conditions also trigger outburst of temper tantrums, and conflict between parents and adolescents. Although prior to the pandemic these children had been facing difficulties even while attending special schools, but in due course they had learnt to develop a schedule to adhere to for most of the time of the day. To cater to these challenges, it is difficult for parents to handle the challenged children and adolescents on their own, as they lack professional expertise and they mostly relied on schools and therapists to help them out."  S. Singh et al, *Impact of COVID-19 and lockdown on mental health of children and adolescents: a narrative review with recommendations*, Psychiatry Res. 2020, available at https://pubmed.ncbi.nlm.nih.gov/32882598/.

Although policies of social distancing and masking have drastically reduced the spread of COVID-19, scientific research makes clear that younger children are less susceptible to COVID-19 and less infectious than older ones, that for most infections of COVID-19 cases reported in children, infection was acquired outside of school, and that closing schools was substantially less effective at reducing

community transmission of COVID-19 than other social distancing interventions. World Health Organization, Slideshow Presentation, What we Know About COVID-19 Transmission in Schools, available at https://www.who.int/docs/default-source/coronaviruse/risk-comms-updates/update39-covid-and-schools.pdf?sfvrsn=320db233_2.   In fact, the World Health Organization has advised that, in light of the myriad negative impacts of forcing children to remain at home with or without virtual learning, closure of schools should be considered "only if there is no other alternative."  Likewise, several major news outlets have reported several studies indicating no consistent relationship between in-person K-12 schooling and the spread of COVID-19. Id.

Likewise, on November 19, 2020, the CDC Director Dr. Robert Redfield stated that K-12 schools should remain open because data shows that schools are among the "safest places" that kids can be from the pandemic, and attempts to close schools are nothing more than an "emotional response."  Ryan Saavedra, CDC Director: Schools Among 'Safest Places' Kids Can Be, Closing Schools An 'Emotional Response' Not Backed By Data, (Nov 19, 2020), *available at* https://tinyurl.com/y4prcdpe.

Moreover, ""Today, there's extensive data that we have—we've gathered over the last two to three months—that confirm that K-12 schools can operate with face-to-face learning and they can do it safely and they can do it responsibly,"

Redfield said. "The infections that we've identified in schools when they've been evaluated were not acquired in schools. They were actually acquired in the community and in the household." *Id.* Indeed, recently, CHOP PolicyLab has issued guidance that stated that in communities that are experiencing community transmission, "Community mitigation efforts—principally gathering size limitations, restaurant/bar restrictions and enforcement—should precede any alteration to plans for in-school learning, which should be a last resort." Children's Hospital of Philadelphia PolicyLab, *COVID-19 Outlook: Finding Safe Harbor, While Looking Forward*, *available at* https://tinyurl.com/y5w6dkjp.

Specifically with regard to Thanksgiving, the guidance states:

> In the context of accelerating community transmission, remote learning until after the upcoming Thanksgiving holiday provides an opportunity to stop the spread of infection that includes the whole family, given the high positivity rate of children in many areas (particularly those ages 11-18). Yet, since younger children are less susceptible to symptomatic infection, remain in more consistent cohorts, are likely more compliant with in-school safety protocols, and do not have the wider network of social contacts through sports and other activities that older youth do, elementary school and child care could remain in-person. We also continue to advise that students with special education needs might be prioritized for in-school services in small cohorts, given the greater difficulty they may have learning virtually and the services they receive during the school day.

*Id.*

On November 19, 2020, Governor Wolf issued a joint statement with Governors of New Jersey, New York, Delaware, Connecticut, Rhode Island, and Massachusetts as follows:



*Medical research as well as the data from Northeastern states, from across the country, and from around the world make clear that in-person learning is safe when the appropriate protections are in place, even in communities with high transmission rates. In-person learning is the best possible scenario for children, especially those with special needs and from low-income families. There is also growing evidence that the more time children spend outside of school increases the risk of mental health harm and affects their ability to truly learn.*

New Jersey Governor Phil Murphy • New York Governor Andrew Cuomo • Pennsylvania Governor Tom Wolf • Delaware Governor John Carney • Connecticut Governor Ned Lamont • Rhode Island Governor Gina Raimondo • Massachusetts Governor Charlie Baker

Notwithstanding the research and guidance issued by the CDC and the Pennsylvania Governor, on November 12, 2020, the Montgomery County Board of Health ordered all schools in Montgomery County from kindergarten through twelfth grade, both public and private, including special needs services, to cease in-school operations and switch to virtual learning from November 23, 2020 until December 6, 2020. The Board reserved the right to extend this closure order at its upcoming meeting on December 2, 2020.

Based upon this research, it is clear that, without an immediate Order enjoining Defendants from enforcing the Order, Plaintiffs will be irreparably harmed. That is, Plaintiff and their children may suffer immeasurable impacts on its mental and emotional health as well as the children's long-term academic

performance. "An injury is deemed irreparable if it cannot be adequately compensated by an award of damages." *Greyhound Lines, Inc. v. Peter Pan Bus Lines, Inc.*, 845 F. Supp. 295, 300 (E.D. Pa. 1994). The court can enjoin government action to enforce "an unconstitutional act, violating the Federal Constitution." *Morales v. TWA*, 504 US 374, 381 (1992). Thus, Plaintiffs implore this Court to immediately enjoin enforcement of Defendants' Order through a temporary restraining order.

### C. Less harm will result to the Defendants if the temporary restraining order is issued than to plaintiffs if the temporary restraining order is not issued.

"[T]he basic purpose behind the task of balancing the hardships to the respective parties is to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the party seeking the injunction." *Prudential Ins. Co. of America v. Stella*, 994 F. Supp. 308, 316-17 (E.D. Pa. 1998) (citing *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 196 (3d Cir. 1990)).

The harm that a temporary restraining order would inflict upon Defendants is non-existent. Indeed, enjoining the enforcement of the Order at issue would have absolutely no impact upon Defendants. To the contrary, enjoining the enforcement of this Order would put Defendants in line with the surrounding counties' decisions on school closure (either not to close any schools, not to close k-5, and uniformly

not to close private schools at all), the CDC guidance (not to shut schools), and the CHOP PolicyLab's explicit guidance (not to shut schools).

Defendants may continue to issue guidance to entities in the County, including other public and commercial facilities, populated by adults who are much more likely to become infected with and to transmit COVID-19 such as casinos, retail stores, bars, restaurants, gyms, extra-curricular sports, and places that hold religious services including churches and synagogues.

The impact upon Plaintiffs, however, is exorbitant.  Schools provide an essential source of meals and nutrition, health care including behavioral health supports, physical activity, social interaction, supports for students with special education needs and disabilities, and other vital resources for healthy development. Sharfstein JM, Morphew CC. *The urgency and challenge of opening K-12 schools in the fall of 2020*. JAMA. 2020;324(2):133-134. doi:10.1001/jama.2020.10175; Esposito S, Principi N., *School closure during the coronavirus disease 2019 (COVID-19) pandemic: an effective intervention at the global level?*, JAMA Pediatr. Published online May 13, 2020. doi:10.1001/jamapediatrics.2020.1892.

Plaintiffs would be forced not to interact with their peers and their teachers, and not to receive a proper education and religious instruction. In April of 2020, the Brookings Institute published a piece quantifying the long-term impact of lost earnings on young people and the future global economy of this school closures.

George Psacharopoulos, Harry Patrinos, Victoria Collis, and Emiliana Vegas, *The COVID-19 cost of school closures*, Brookings (April 29, 2020), *available at* https://tinyurl.com/y72ks3qa. It emphasizes that "when children lose out on education, they lose out on future opportunities including economic benefits, such as additional earnings, with far-reaching consequences" and concludes that "For whole societies closing down education today, there will likely be significant consequences tomorrow."

> We begin by assuming that every additional year of schooling equates to 10 percent in additional future earnings. We then use the number of months of education closures to estimate the loss in marginal future earnings. For example, if Country X closes its schools and universities for four months, the loss in marginal future earnings would be 2.5 percent per year over a student's working life. We apply this assumption to the world's largest economy, the United States of America and its 76 million students, as our starting point. We model on a 45-year working life, a discount rate of 3 percent, and mean annual earnings of $53,490.
>
> This quick estimate suggests lost earnings of $1,337 per year per student: a present value loss of earnings of $33,464 (63 percent of a year's salary at current average wage rates). While this may not sound like too much of an individual price for young people to pay in the fight against COVID-19, a look at the impact on the whole of the country is much more sobering.
>
> In this model, the cost to the United States in future earnings of four months of lost education is $2.5 trillion—12.7 percent of annual GDP. And with well over half the

country's states deciding to keep schools and universities closed until the fall at the earliest, much of this loss may well materialize. Extrapolating to the global level, on the basis that the U.S. economy represents about one-quarter of global output, these data suggest the world could lose as much as $10 trillion over the coming generation as a result of school closures today. *Id.*

Moreover, although home should be the safest place for a child, sexual, psychological and physical abuse can occur. Since COVID emerged and lockdowns have been instituted, rates of domestic violence and partner abuse have increased globally impacting women and children most often. Bradbury-Jones C, Isham L. The pandemic paradox: the consequences of COVID-19 on domestic violence. J Clin Nurs. 2020;29(13-14):2047-2049. Likewise, school is a place that many students receive nutritional assistance from the state. School is a place of safety for our children, and a portion of them will be harmed by being forced to stay at home.

This Court must consider the potential extent of a parallel mental health pandemic. Studies have found that, during the time of the School Closure Order, children ages three to six were more likely to exhibit symptoms of clinginess and children of all ages demonstrated increased irritability and inattention than their school-going peers as well as disturbed sleep, nightmares, poor appetite, agitation, and separation related anxiety. Other studies found that home confinement of children and adolescents was associated with uncertainty and anxiety attributable to

disruption in their education, physical activities and opportunities for socialization, and that the absence of structured setting of the school for a long duration result in disruption in routine, boredom and lack of innovative ideas for engaging in various academic and extracurricular activities.  Indeed, research demonstrated that many children have expressed lower levels of affect for not being able to play outdoors, not meeting friends and not engaging in the in-person school activities and that these children have become more clingy, attention seeking and more dependent on their parents due to the long term shift in their routine.  Finally, some studies have presumed that children might resist going to school after the lockdown is over that these children may face difficulty in establishing rapport with their mentors after the schools reopen. Consequently, these studies conclude, the constraint of movement imposed on them can have a long-term negative effect on their overall psychological well-being.

Moreover, the impact of the Order on children with special needs is particularly grave, and its irrationality that much more inexcusable. Studies have emphasized the impact that the Stay At Home Order and School Closure Order have had on children with special needs: "With the closure of special schools and day care centers these [special needs] children lack access to resource material, peer group interactions and opportunities of learning and developing important social and behavioral skills [which] in due time may lead to regression to the past behavior as

they lose an anchor in life, as a result of this, their symptoms could relapse." J. Lee, Mental health effects of school closures during COVID-19, LANCET. CHILD ADOLESC.   HEALTH,   S2352-4642(20)30109-7,   available   at https://www.thelancet.com/journals/lanchi/article/PIIS2352-4642(20)30109-7/fulltext.  In turn, these studies note that "[t]hese conditions also trigger outburst of temper tantrums, and conflict between parents and adolescents. Although prior to the pandemic these children had been facing difficulties even while attending special schools, but in due course they had learnt to develop a schedule to adhere to for most of the time of the day. To cater to these challenges, it is difficult for parents to handle the challenged children and adolescents on their own, as they lack professional expertise and they mostly relied on schools and therapists to help them out."  S. Singh et al, Impact of COVID-19 and lockdown on mental health of children and adolescents: a narrative review with recommendations, Psychiatry Res. 2020, available at https://pubmed.ncbi.nlm.nih.gov/32882598/.

School closures also affect parents' ability to work. One analysis estimated that a 12-week school closure could cost the US $128 billion in lost productivity, including a 19% reduction in work hours among health care personnel. Lempel  H, Epstein  JM, Hammond  RA.  Economic cost and health care workforce effects of school closures in the US.   PLoS Curr. 2009;1:RRN1051.

Because the issuance of this TRO would put Defendants in the same position of the neighboring counties, and in agreement with the CHOP PolicyLab and the CDC, it would not suffer harm. In contrast, students would suffer very real and immediate harm, in addition to long term harm, if the Order is permitted to issue. Thus, the balancing of hardships weighs heavily in Plaintiffs' favor.

### D. The balance of the public interest weighs in favor of Plaintiffs.

The public interest in this case also weighs in favor of issuance of a temporary restraining order.   The public interest is greatly served by preventing the enforcement of an ordinance that directly violates constitutional provisions and does not remedy any documented problems. *See Council of Alternative Political Parties v. Hooks*, 121 F.3d 867, 883-884 (3rd. Cir. 1997) (stating that "[i]n the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights.").   Moreover, because the harm in this case involves a municipality interfering with what are clearly federal powers, the potential harm is to the entire nation. As the Supreme Court has noted, the "[l]egal imposition of distinct, unusual and extraordinary burdens and obligations upon aliens . . . bears an inseparable relationship to the welfare and tranquility of all the states, and not merely to the welfare and tranquility of one." *Hines*, 312 U.S. at 66 (emphasis added).

Likewise, the public has an interest in its schools, in particular religious private schools, being able to choose what instruction to provide to its children. All

of the schools within the County offer virtual instruction to its students, and some have been offering in-school instruction as well. We do not dispute whether the County has the authority to issue *guidance* to schools regarding instruction, but that guidance must be based on data, not politics. Schools are in the best position to evaluate whether it should open for in-person instruction, and this decision should be based open not only the incidence of COVID in its County and Zip Code, but also its unique student, teacher and parent bodies, COVID prevention protocols, resources, low PCR positivity rate within our school, the school's contact tracing abilities, the school's communications with the county, and the school's further COVID mitigation efforts being undertaken by the school. Put simply, the County should issue guidance regarding standards for opening for in-person instruction, and our schools are in the best position to consider the guidance in light of its unique circumstances.

If granted, injunctive relief will simply restore the parties to their proper positions, as they existed before Defendants' Order.  Defendants can continue to issue guidance to schools and the community, and the public will continue to be able to choose the path they believe to be in their own best-interest.  Plainly, the public interest weighs in favor of the temporary restraining order.

## IV.   CONCLUSION

For the reasons set forth in the declarations attached hereto and this memorandum of law in support of Plaintiffs' Motion for Injunctive Relief and a Temporary Restraining Order Plaintiffs respectfully request this Court to enter a preliminary injunction and temporary restraining order to prohibit the enforcement of an Order issued by the Montgomery County Office of Public Health and the Montgomery County Board of Health on November 13, 2020, closing all schools in Montgomery County Pennsylvania from November 23, 2020, until December 6, 2020, unless such time as this Orders' lawfulness is determined.

Respectfully Submitted,

Dated:  November 20, 2020

By:/s/Thomas E. Breth, Esquire
Thomas E. Breth, Esquire
PA I.D. No. 66350

Dillon McCandless King
Coulter & Graham, LLP
128 West Cunningham Street
Butler, PA 16001
(724) 283-2200
tbreth@dmkcg.com

*Counsel for Plaintiffs*